IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| MICHAEL R. PETERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-3451-CV-S-NKL |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Pending before the Court is Plaintiff Michael R. Peters's ("Peters") Motion for Summary Judgment [Doc. # 8]. Peters seeks judicial review of the Commissioner's denial of his request for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.* The Court finds that the Administrative Law Judge's decision was supported by substantial evidence in the record as a whole.

**I.     Background**

Peters applied for benefits on July 23, 2002, alleging disability since June 26, 1999.  Peters alleged that his disabling impairments were lower back pain and foot pain. (Tr. 40, 72-73.)  Peters was forty-four years old at the time of the ALJ's decision that rejected his claim for benefits.

**A.     Peters's Application**

In July 2002, Peters submitted his application for disability benefits.  (Tr. 102-04.)

1

Regarding his daily activities, Peters stated that he could no longer run or stand for more than 30 minutes at a time. He also stated that he could not walk without pain. Regarding his household chores, Peter stated that he could still keep his home clean, but it took him longer and it was painful. In his application, Peters also stated that he went to school every day while pursuing a bachelor's degree in English.

Peters pursued his undergraduate degree during his alleged period of disability. He initially attended Avila College beginning in 2000 and the University of Missouri-Kansas City. Peters subsequently transferred to Southwest Missouri State University ("SMSU") in the spring of 2002. Peters was a senior at SMSU at the time of his hearing.

Peters had also worked after his alleged onset date. In 2000, he earned $664.75. In 2001, he earned $4,078.90. In 2002, he earned $1,361.78. These earnings are insufficient to represent substantial gainful activity.

    **B.**    **Sources of Treatment**

        *1.*    *Peter Boylan, M.D. ("Boylan")*

In August 1999, Peters consulted with Boylan. Boylan noted that Peters had fallen 27 feet from the roof of a building in June 1999. The fall caused fractures in Peters's left foot and a fracture in his right heel. After the fall, Peters had a CAM walker for four weeks and then four weeks of toe touch weight bearing. (Tr. 119.) During the August 1999 consultation, Peters had some weight-bearing on his right foot and his x-rays showed continued fracture of the right calcaneus with a loss of the normal Bohler's angle and progressive callus formation. (Tr. 120.) X-rays of Peters's left foot showed healed

2

Case 6:04-cv-03451-NKL   Document 13   Filed 06/21/05   Page 2 of 12

fractures and x-rays of Peters's lumbar spine reflected a previous compression fracture with some mild narrowing of the lumbosacral disc space. (Tr. 120.) Peters complained of pain in his left foot, right heel, and lower back, and he was treating his pain at the time with two aspirins per day. (Tr. 119.) Boylan diagnosed Peters with a lumbosacral sprain, a fracture of his right calcaneus, and a fracture of the third, fourth and fifth metatarsals. Boylan stated that Peters was not yet ready to return to work and recommended a work conditioning program. (Tr. 121.)

Boylan examined Peters again in September 1999. By this time, Peters had engaged in four physical therapy treatments and he had worked his way off crutches. Boylan noted that Peters continued to walk with a slight limp, but that he was making "excellent progress." (Tr. 118.) Boylan noted less tenderness regarding Peters's right heel and Boylan noted that he believed Peters would be well enough in two weeks to consider returning to work. (Tr. 118.)

Boylan examined Peters again in October 1999. Boylan noted that Peters had no particular complaints about his left foot and that it appeared to be healing satisfactorily. (Tr. 117.) Peters continued to complain of pain in his right heel and Boylan prescribed total contact inserts and ordered that Peters continue with his work conditioning program. (Tr. 117.) Boylan stated that Peters was not ready to return to work.

In December 1999, Peters had been released from his work conditioning program and he consulted with Boylan again. Boylan noted restricted motion in Peters's right ankle and foot with complaints of tenderness. (Tr. 114.) There was a 50 percent

3

reduction in dorsiflexion and plantar flexion. Boylan recommended that Peters return to work on light duty as long as he did not run and he avoided walking more than one-third of the time. Boylan also stated that Peters should avoid pushing, pulling, or carrying over 60 pounds above the waist level.

### 2.  *Zita Surprenant, M.D. ("Surprenant")*

At the request of a workers' compensation attorney, Peters consulted with Surprenant in March 2000. During the examination, Peters reported that he had pain in his right heel three to four times per day when he would initially step off, his maximum tolerance for standing or walking was four hours at a time, he had numbness in the plantar aspects of both feet, and that he had constant lower back pain, although Peters denied any radicular pain. To control his pain, Peters stated that he took aspirin three to four times per week, more often for the pain in his feet rather than his back. (Tr. 130-32.)

Surprenant noted that the range of motion in Peters's right ankle was slightly lower than the left, but inversion and eversion of both feet were normal, as was toe flexion and extension. Surprenant indicated that Peters could walk or stand for four hours in an eight-hour workday and he recommended a sit/stand work option if possible. Surprenant also stated that Peters could occasionally lift up to 60 pounds.

### 3.  *Charles Ash, M.D. ("Ash")*

At the request of the Social Security Administration, Peters consulted with Ash in October 2002. Peters used no cane and he walked without any limp or list. Peters also walked on his heels and toes satisfactorily and he had normal ranges of motion in almost

4

Case 6:04-cv-03451-NKL   Document 13   Filed 06/21/05   Page 4 of 12

all of the joints tested. Ash diagnosed Peters with fractures of the feet that had healed and a compression deformity of L1. He also commented that Peters's allegations were subjective and that there was no objective evidence that required a measurable limitation of work-related function. Ash completed a checklist indicating that Peters could lift up to 25 pounds frequently, could stand or walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, push and pull in an unlimited manner, and use foot controls. (Tr. 141.)

### 4. *Judy Robbins, M.D. ("Robbins")*

Robbins did not examine Peters, but she did review his medical records in October 2002. Robbins opined that Peters could lift twenty pounds occasionally and ten pounds frequently and that he could stand and sit for six hours a day. However, Robbins indicated that Peters was limited in his ability to push and/or pull in his lower extremities and he should only occasionally climb, crouch, and crawl.

### 5. *Kitchen Clinic*

In March 2003, Peters presented to the Kitchen Clinic for treatment of his back pain. Peters was prescribed Vioxx for his back pain.

### 6. *Dan Mostrom, D.P.M. ("Mostrom")*

Peters consulted with Mostrom in July 2003. Mostrom was a podiatrist. Mostrom noted that Peters complained of acute pain in both feet. Mostrom noted that Peters's gait revealed antalgia and degenerative joint disease in the right subtalar joint. Mostrom diagnosed Peters with degenerative joint disease, sinus tarsi pain, and pain in the limb

5

accompanied by difficulty walking.

During his examination of Peters in July 2003, Mostrom also filled out a Medical Source Statement-Physical. Mostrom opined that Peters was able to lift and/or carry ten pounds frequently and fifteen pounds occasionally; could stand and/or walk fifteen minutes continuously and for two hours throughout an eight-hour workday; could sit continuously for forty-five minutes and for six hours throughout an eight-hour workday; was limited in his ability to push and/or pull; and should never climb, balance, stoop, kneel, crouch, or crawl. Mostrom also stated that Peters should lie down 3-4 times per day for thirty minutes each time.

Mostrom treated Peters again in November 2003. Mostrom diagnosed Peters with tenosynovitis peroneal right and pain in the limb. Mostrom recommended a pain injection for Peters.

In December 2003, Peters again consulted with Mostrom who diagnosed Peters with mononeuritis, lateral ankle right, tenosynovitis near the sural nerve course, sinus tarsi pain left, and pain in the limb. Mostrom recommended another round of pain injections for Peters.

### C. Hearing Testimony

#### 1. *Peters*

Peters testified at the hearing that he wants to continue his education to obtain a master's degree. He also stated that he would likely end up doing free lance writing with his undergraduate English degree. (Tr. 199.) Peters stated that he rides his bicycle to get

6

around campus or he takes the shuttle. (Tr. 194.)

Peters testified that he suffered from severe pain. He stated that he could walk on a flat surface for about two blocks, but that he had problems navigating stairs. Peters testified that he could stand for fifteen minutes before needing to change position and that he could sit for one hour before needing to change position. Peters testified that he was able to lift twenty to thirty pounds at a time, but it was uncomfortable. He also stated that the pain was rated at a ten approximately five to six days per month. (Tr. 200-02.)

Peters also testified that he broke his clavicle in October 2002, but he did not see a doctor. Peters claimed that the broken clavicle caused pain in his shoulder that limited his ability to use his left arm for reaching and handling objects.

### 2. *Vocational Expert*

The vocational expert stated that an individual who was forty four years old, was a senior in college with a good ability to read and write and use numbers, who had the same past work as Peters and was limited as Peters testified could not perform work in the national economy. (Tr. 212.)

The vocational expert also testified that if an individual were limited in the same manner as the assessments submitted by Robbins and Ash, then that individual could perform work as a programmer and telemarketer.

### D. The ALJ's Opinion

The ALJ gave no weight to Mostrom's opinion regarding Peters's capabilities because Mostrom had examined Peters only once when he gave his opinion and

7

Mostrom's assessment contradicted the assessments by the other examining physicians. The ALJ also found that Peters's claims were not totally credible in light of his daily activities.

The ALJ found that Peters had severe impairments of his back and fractured bones in his feet. The ALJ assessed Peters's residual functional capacity ("RFC") as follows: can lift 20 pounds occasionally and 10 pounds frequently; can stand and/or walk six out of eight hours; can sit six out of eight hours; should avoid pushing/pulling with his lower extremities or work around hazardous machinery; and can occasionally climb, crouch, or crawl. Based on Peters's RFC, the ALJ determined that he could perform his past relevant work as a programmer and telemarketer. (Tr. 19.)

## II. Discussion

### A. Mostrom's Assessment

Peters alleges the ALJ erred when he gave no weight to Mostrom's opinion when he calculated Peters's RFC. Peters alleges that the ALJ erroneously gave more weight to Robbins, Ash, and Boylan, even though they were not Peters's treating physician. The ALJ's decision is supported by substantial evidence in the record.

In his opinion, the ALJ stated that he gave no weight to Mostrom's opinion because it (1) conflicted with the findings of Robbins, Ash, and Boylan; (2) Mostrom was a podiatrist while the other examiners were physicians; and (3) Mostrom had only examined Peters one time when he filled out his assessment. Implicit in the opinion, and explicit in its findings, is that the ALJ also discredited Mostrom's opinion to some degree

because he did not believe Peters's claims of disabling pain to be credible.

Peters concedes that Mostrom's opinion conflicts with those of the other physicians, but argues that the ALJ should have given greater weight to Mostrom's assessment based on his status as a treating physician, Mostrom's assessment was the most recent, and Mostrom's specialty in podiatry.

### 1. *Overview*

The main point of diversion between Mostrom's opinion and the assessments of the other physicians is that Mostrom recommended that Peters lie down two to three times a day for thirty minutes a time. Like Robbins and Ash, Mostrom stated that Peters could sit for six hours in an eight-hour workday, although Mostrom opined that Peters could stand for only two hours in an eight-hour workday.

### 2. *Competing Physicians*

Although Mostrom was designated as a treating physician, it is difficult to comprehend that he would be in a better position to provide an assessment than Boylan, who treated Peters immediately after his injury in 1999 and examined him four times. Although Peters claims to have suffered from degenerative joint disease, which would have increased the severity of his limitation between the time of Boylan's opinion and Mostrom's assessment, Mostrom is the only reviewing doctor to have diagnosed such a condition and the implications of such a diagnosis, even if it is incorrect, are unclear. Thus, even though Mostrom was designated by Peters as his treating physician, it was, in fact, Boylan who initially reviewed Peters injury and worked with him through his

9

rehabilitation and Boylan recommended that Peters return to light duty work in 1999.

Moreover, Ash had examined Peters at least once, which placed him in as good a position as Mostrom to determine Peters's functional capabilities. While this issue may also cut in favor of giving greater weight to Mostrom's opinion, it is important to note that Ash's opinion was consistent with that of the other physicians while Mostrom's opinion was not. Thus, although Ash only examined Peters once, it was not error for the ALJ to give Ash's opinion greater weight than Mostrom's where Ash's findings were consistent with the other physicians' assessments.

### 3. *Timeliness of Mostrom's Opinion*

Although Mostrom's assessment was the most recent of the four opinions at issue, that fact alone does not make it more credible than the opinions of the other three physicians, particularly where there is remarkable consistency between Boylan's opinion--which was issued in 1999--and the opinions of Robbins and Ash, which were issued in 2002, thereby suggesting that Peters's condition had remained virtually unchanged over the course of three years. Mostrom's assessment appears to be an aberration and its timeliness alone cannot support overturning the ALJ's decision.

### 4. *Mostrom as a Specialist*

Finally, Peters argues that Mostrom's opinion should be given greater weight because he was a podiatrist specializing in foot care. While Mostrom's specialty may be helpful regarding other impairments, it has no bearing on his recommendation that Peters lie down two to three times per day. In fact, Mostrom did not explain why Peters would

need to lie down, nor did he explain in his assessment why Peters's feet pain would not be relieved by sitting while he worked. Thus, Mostrom's specialty in podiatry appears to be irrelevant regarding the impairments that Peters seeks to incorporate.

### 5. *Peters's Credibility*

In his opinion, the ALJ also found that Peters was not credible. The ALJ relied on Peters's ability to pursue full-time education and his ability to ride a bicycle around campus. Moreover, Peters did not seek any treatment whatsoever for his pain between 1999 and 2002, which suggests that he was able to function without any limitations during that time period. Peters's employment during his alleged period of disability also suggests that he was not suffering from disabling pain, even though his income was nominal. Given Peters's lack of treatment history and his daily activities, the ALJ discredited his claims of pain.

The ALJ's decision to give no weight to Mostrom's opinion is supported by substantial evidence in the record and the Court denies Peters's appeal on this point.

### B. Peters's RFC

Peters alleged that the ALJ erred when he calculated Peters's RFC and did not account for shoulder limitations that arose from his broken clavicle and Peters's pain.

There is no objective medical evidence of Peters's alleged shoulder limitations. Peters never visited a doctor nor did any of the physicians who treated him after October 2002 note a healed clavicle. Thus, there was no basis for the ALJ to include the shoulder limitations that arose from the broken clavicle in the RFC. This was not error.

11

Similarly, it was not error for the ALJ to exclude Peters's alleged debilitating pain in the RFC because the ALJ did not find that Peters's claims of disabling pain were credible. An ALJ must include only those impairments that are credible and it was not error for the ALJ to exclude Peters's claims of disabling pain from his RFC.

**III. Conclusion**

An examination of the ALJ's decision reveals that it is supported by substantial evidence on the record as a whole. Accordingly, it is hereby

ORDERED that Peters's Motion for Summary Judgment [Doc. # 8] is DENIED. The decision of the Commissioner is affirmed.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

DATED: June 21, 2005
Kansas City, Missouri